```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK


In re:                              :
                                         Docket #17cv2120
 NANCY AMHAZ,                       :

               Plaintiff,           :

   - against -                      :

 BOOKING.COM (USA) INC., et al.,    : New York, New York
                                      December 22, 2017
               Defendants.          :

------------------------------------ :


                    PROCEEDINGS BEFORE
                 THE HONORABLE HENRY PITMAN,
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          LEE LITIGATION GROUP, PLLC
                        BY:  C.K. LEE, ESQ.
                            MAWASH JAFFREY, ESQ.
                        30 East 39th Street, Second Floor
                        New York, New York 10016

For the Defendants:     JACKSON LEWIS P.C.
                        BY:  WENDY MELLK, ESQ.
                        666 Third Avenue, 29th Floor
                        New York, New York 10017




Transcription Service:  Carole Ludwig, *Transcription Services*
                        141 East Third Street #3E
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>**Witness**</u> | <u>**Direct**</u> | <u>**Cross**</u> | <u>**Re-<br>Direct**</u> | <u>**Re-<br>Cross**</u> |
|---|---|---|---|---|
| None | | | | |

<u>**E X H I B I T S**</u>

| **Exhibit<br><u>Number</u>** | <u>**Description**</u> | <u>**ID**</u> | <u>**In**</u> | **Voir<br><u>Dire</u>** |
|---|---|---|---|---|
| None | | | | |

```
 1                        PROCEEDINGS                 3

 2            THE CLERK:  Amhaz v. Booking.com, 17cv2120.

 3   Counsel, please state your name for the record.

 4            MR. C.K. LEE:   C.K. Lee.  I'm also with my

 5   colleague, Mawash Jaffrey.  Good morning, Your Honor.

 6            THE COURT:   Good morning.

 7            MS. WENDY MELLK:   Wendy Mellk from Jackson

 8   Lewis (indiscernible).

 9            THE COURT:   All right, good morning all.  We're

10   here today to address some discovery issues.  In that

11   regard I have plaintiff's letter of November 25,

12   defendants' letter of November 29, and there was another

13   letter that Mr. Lee filed on the ECF system at about 6:30

14   last night.  I've skimmed the letter – Mr. Lee,

15   (indiscernible) 6:30 last night attaching a transcript

16   from December 6?  You know, a lot of judges in this court

17   were born at night but they weren't born last night, and

18   what you're doing is pretty apparent.

19            MR. LEE:   Your Honor --

20            THE COURT:   Yeah.

21            MR. LEE:   What I was trying to do was just to

22   provide the Court with some additional information.

23            THE COURT:   6:30, what, 16 hours before the

24   conference?  Fifteen and a half hours before the

25   conference.
```

| 1 | PROCEEDINGS | 4 |

2          MR. LEE:   I'm sorry, Your Honor, but I had

3  wanted to submit it earlier, but because I was in a

4  mediation --

5          THE COURT:   Continuously from December 6 until

6  6:30 last night?

7          MR. LEE:   Well, it was not continuous, Your

8  Honor, but there's nothing like an impending date to

9  stimulate ensuring that --

10          THE COURT:   Yeah, and getting over on your

11  adversary had nothing to do with it, right?

12          MR. LEE:   It really was not intended.  I really

13  had wanted to get it in earlier, but, unfortunately,

14  because of my schedule and the different drafts that I had

15  to go through during the course of the day, it did not get

16  submitted until later in the evening.  But I do apologize,

17  Your Honor.

18          THE COURT:   Well, I know what you're doing.

19  And it really, it doesn't play.

20          MR. LEE:   The alternative, Your Honor, was that

21  I would've just came in and told the Court orally about --

22          THE COURT:   No, the alternative was you

23  could've filed it on the 7th, the 8th, the 9th, the 10th,

24  the 11th, the 12th.  It was a December 6 transcript.

25          MR. LEE:   I --

```
 1                           PROCEEDINGS                    5

 2              THE COURT:   Even if you got it a week later,

 3    that would've been the 13th.

 4              MR. LEE:   I understand, Your Honor, but there's

 5    – there is --

 6              THE COURT:   There's nothing like the tactical

 7    advantage of serving something like 6:30 the before --

 8              MR. LEE:   Your Honor --

 9              THE COURT:   -- a 3 o'clock conference.

10              MR. LEE:   Your Honor, it's an advantage that I

11    don't think I need.  And the reality really was I wanted

12    to get it in earlier, and, unfortunately, I wasn't able to

13    focus my attention in preparing for this hearing until a

14    day or two beforehand.  And so that's why I wanted to

15    submit a follow-up.  I apologize, Your Honor.

16              THE COURT:   I've had attorneys doing this

17    nonsense for 20 years, you know, I don't know why they do

18    it, I really don't.  All right.  Where do things stand?  I

19    understand from defendants' letter things have moved on

20    somewhat since the November 22 letter?  Where do things

21    stand, Mr. Lee?

22              MR. LEE:   Sure.  Well, I think in terms of the

23    depositions, the depositions have been scheduled.  So that

24    issue is resolved.  And I think in terms of discovery, the

25    main issue that is outstanding is regarding class
```

1

2   discovery and e-discovery.  That's really the main issues

3   that are outstanding which we hope to resolve this

4   morning, Your Honor.

5           THE COURT:  All right.  Well --

6           MR. LEE:  And I'm happy --

7           THE COURT:  I looked at the discovery

8   responses.  Let me turn to defendants' counsel.  Miss

9   Mellk, I looked at your discovery responses, and do they

10  comply with the December 2015 amendments to the Federal

11  Rules of Civil Procedure?

12          MS. MELLK:  Your Honor, we felt that they did

13  because --

14          THE COURT:  Are they specific?  Do they state

15  whether or not documents are being produced?

16          MS. MELLK:  I believe they did state when we

17  did produce documents.

18          THE COURT:  Are they specific?

19          MS. MELLK:  Are they specific as identifying

20  the --

21          THE COURT:  No, are your responses, your

22  objections stated with specificity as is now required by

23  Rules 33 and Rules 34?

24          MS. MELLK:  We felt that they were specific.

25  Certainly, if Your Honor wants --

```
 1                          PROCEEDINGS                  7
 2               THE COURT:   They're clearly not.
 3               MS. MELLK:   If Your Honor would like us to, we
 4    can amend it, but we felt --
 5               THE COURT:   But I can also find a waiver.
 6               MS. MELLK:   We did not intend to waive our
 7    objections, Your Honor.  We felt --
 8               THE COURT:   Yeah, but I'm not sure you intended
 9    to comply with the December 15 amendments either.
10               MS. MELLK:   We felt that they were incredibly
11    overbroad (inaudible), that was the issue.
12               THE COURT:   And do you explain how they're
13    overbroad in the objections?
14               MS. MELLK:   We do, Your Honor, I believe.
15               THE COURT:   Well, you may want to take a look
16    at Judge Peck's decision in Fisher v. Forrest from earlier
17    this year.  It was on the front page of the Law Journal.
18    Well, the other thing you may want to do is take a look at
19    Hickman v. Taylor again.  It's only 70 years old.  Justice
20    Murphy wrote in Hickman v. Taylor, "We agree, of course,
21    that the deposition discovery rules ought to be accorded a
22    broad and liberal treatment.  No longer can a time honored
23    cry of fishing expedition serve to preclude a party from
24    inquiring into the facts underlying his opponent's case."
25                    You make that objection at least twice in your
```

```
 1                          PROCEEDINGS                    8
 2  letter.  It's a disfavored objection.  It's been disfavored
 3  for 70 years.  Discovery has its limits, but fishing
 4  expedition, you know, Justice Murphy I think disposed of
 5  it 70 years ago.  Let's get to the heart of the matter
 6  though and talk about whether or not precertification
 7  discovery here is appropriate.  Why don't I hear from Mr.
 8  Lee on that issue and then I'll hear from defense counsel.
 9            MR. LEE:   Thank you, Your Honor.  Just in terms
10  of being able to conduct discovery on the class, I think
11  it's important that we be allowed to obtain payroll
12  information to ascertain that other account managers were
13  paid --
14            THE COURT:   What discovery has been permitted
15  hasn't been limited to the identity of potential class
16  members?
17            MR. LEE:   In terms of the - I don't recall that
18  there's been a ruling limiting it to identity of class
19  members, but --
20            THE COURT:   Well, what did Judge Maas do in
21  Feit, in Faye, excuse me?
22            MR. LEE:   Sure, Your Honor, but I think there's
23  been various ranges --
24            THE COURT:   What did Judge Maas do in Faye?
25  That's the case you cite in your letter.
```

```
 1                          PROCEEDINGS                    9

 2            MR. LEE:   He allowed for identities of

 3  individuals, but --

 4            THE COURT:   He permitted the discovery of

 5  names, positions, job titles, dates of employment, last

 6  four digits of social security numbers, addresses, and

 7  telephone numbers.

 8            MR. LEE:   Sure.

 9            THE COURT:   Where precertification discovery

10  has been permitted, hasn't it been limited?

11            MR. LEE:   I think in that context there was a

12  limit, but because here it's an exemption case, and so I

13  think it would be helpful to ascertain just by the payroll

14  records that the other account managers are paid in the

15  same manner at the various offices --

16            THE COURT:   Is that an appropriate part of

17  certification?

18            MR. LEE:   I believe it's --

19            THE COURT:   Is there a case that suggests that

20  kind of discovery is appropriate prior to certification?

21            MR. LEE:   Yes, Your Honor, it's the - it's in

22  the letter that we submitted to the Court yesterday.

23            THE COURT:   The one that you submitted 15 ½

24  hours ago, 6:30 last night.

25            MR. LEE:   That's right, Your Honor.
```

```
 1                        PROCEEDINGS                10
 2          THE COURT:   I haven't read it.
 3          MR. LEE:   I understand.  And we submitted it to
 4   the Court just because I wanted to put something in
 5   writing, and the alternative was just coming in here today
 6   to tell the Court orally, but the case was with Judge
 7   Ramos, and it's Alvarez v. Schnippers, and he allowed
 8   payroll records to be provided in anticipation of a
 9   collective motion.  And, similarly, on Serenity Spa,
10   Benevides v. Serenity Spa was another decision that
11   supported the same assertion that discovery is appropriate
12   to either prove or disprove the plaintiff's claims for
13   collective or class certification.
14          THE COURT:   What did the plaintiff here do?
15          MR. LEE:   She's an account manager.  And so
16   what they did was booking.com is a website that sells
17   accommodation bookings.  So it's basically like a
18   hotel.com or Expedia, and a consumer can go on the website
19   and reserve hotel rooms at a discount from different types
20   of hotel chains.  In order to do their job, what they do
21   is they're basically salespeople.  They correspond with
22   hotel clients in order to obtain inventory of rooms at
23   competitive rates so that they can list them on the
24   booking.com website, and booking.com generates revenues by
25   taking a percentage commission off of that.
```

```
 1                            PROCEEDINGS                  11
```

 2          THE COURT:   But what – I'm looking at a case

 3 that Judge Ramos decided involving the same issue in 2015,

 4 a case called Mata v. Footbridge LLC where he limited

 5 discovery to the names, job titles, last known mailing

 6 addresses, and email addresses, telephone numbers, dates

 7 of employment of named coworkers of the plaintiff.  Did he

 8 permit broader discovery in the December 6 transcript that

 9 you provided last night?

10          MR. LEE:   He did.

11          THE COURT:   What --

12          MR. LEE:   For the Schnippers Restaurants he

13 allowed discovery for multiple locations.

14          THE COURT:   Of what?

15          MR. LEE:   Of the workers.

16          THE COURT:   Contact information or something

17 beyond contact information?

18          MR. LEE:   I believe it was beyond contact

19 information.

20          THE COURT:   What information beyond contact

21 information did he permit discovery of?

22          MR. LEE:   Just payroll records, Your Honor.

23 And I know Judge Peck recently had allowed in a case

24 against Park-It Garages, he allowed discovery for all

25 parking attendants across 30 locations in New York City

```
 1                      PROCEEDINGS              12
```

 2   even though the claimant only worked at 4 of the 30

 3   locations specifically to allow the plaintiff an

 4   opportunity to prove or disprove his allegations for class

 5   claims.  And I can supplement that to the Court also.

 6            THE COURT:   For whom are you seeking discovery?

 7   What individuals are you seeking discovery of?  Is it just

 8   other account managers?

 9            MR. LEE:   Yes, it's other account managers.

10   Other account managers, key account managers which are --

11            THE COURT:   Sorry?

12            MR. LEE:   Key, K-E-Y, key account managers.

13            THE COURT:   Key account manager.

14            MR. LEE:   It's a similar title except they

15   handle larger accounts.  And junior account managers which

16   are --

17            THE COURT:   Is the last one junior --

18            MR. LEE:   Junior account managers, yeah.

19            THE COURT:   All right, anything else?

20            MR. LEE:   And so we were looking for, what I

21   think would be fair would be at least a sampling across

22   the different locations for these type of positions across

23   a six-year period.

24            THE COURT:   Well, how do you get to – with

25   respect to the FLSA claim, how do you get to a six-year

1

2    period? I mean when you're talking about folks outside of

3    New York, how do you get to a six-year period?

4              MR. LEE:  Oh, sure.  Well, we can limit the

5    state law period to the relevant period of length where

6    that branch office is, but --

7              THE COURT:  Did plaintiff work in New York,

8    Nevada, or someplace else?

9              MR. LEE:  She worked in Nevada and also New

10   York.  And so --

11             THE COURT:  She's physically in both locations?

12             MR. LEE:  Yes, she was physically in both

13   locations.  And so I think the decisions that Judge Peck

14   made, that Judge Ramos made was for not just doing

15   discovery for the collective motion but for the Rule 23

16   motion.  And the two motions really are independent --

17             THE COURT:  Yeah, but I mean the Rule 23 might

18   get you six years or folks in New York, but I don't know

19   what the rationale would be for six years for people

20   outside of New York.

21             MR. LEE:  I guess it would be – to keep things

22   easier, Your Honor, I can concede to a three-year period.

23             THE COURT:  All right.  Let me hear from

24   defense counsel.

25             MS. MELLK:  Thank you, Your Honor.  So as I see

```
 1                          PROCEEDINGS                    14
 2    it, there's two issues, that, number one, he wants a list
 3    of all, as he defines it, covered employees, and then,
 4    number two, he wants document discovery with respect to
 5    that group of covered employees.  And I'll note that in
 6    his discovery request, Mr. Lee defines covered employees
 7    as account managers and key account managers, not junior
 8    account managers, and Miss Amhaz was never a junior
 9    account manager.
10            THE COURT:   Is there such a position as junior
11    account manager?
12            MS. MELLK:   I don't think there is.  There is a
13    lower position than account manager, which is a non-exempt
14    position, and she never held that position.
15            THE COURT:   What is the lower position that you
16    just referenced?
17            MS. MELLK:   It may be called junior account
18    manager or it may be called coordinator.
19            THE COURT:   All right.  But people in that
20    lower position are not - the defendant has not taken the
21    position that those folks are exempt?
22            MS. MELLK:   Correct.
23            THE COURT:   All right, go ahead.
24            MS. MELLK:   Correct.  So with respect to the
25    lists, Mr. Lee has not given us any reason why he needs a
```

```
 1                        PROCEEDINGS              15
 2  list.  It's unnecessary for his collective action.  The
 3  plaintiff, who we deposed on Tuesday, has been in contact
 4  with many other at least former, maybe current, account
 5  managers and key account managers, and she testified that
 6  she knows how to contact these people --
 7           THE COURT:  How many was she in contact with?
 8           MS. MELLK:  At least eight or nine.
 9           THE COURT:  And how many are there employed --
10           MS. MELLK:  Over this year three-year period --
11           THE COURT:  Yeah.
12           MS. MELLK:  -- there's a couple of hundred.
13           THE COURT:  All right.
14           MS. MELLK:  And she, in her affidavit that she
15  submitted, again, at 6:45 the night before her deposition,
16  she refers to how she's spoken to many, many people, she's
17  spoken to people in every single office where there are
18  account managers and key account managers.  And so clearly
19  she knows how to contact people to be able to provide Mr.
20  Lee with information she may need to move for
21  certification.
22           With respect to --
23           THE COURT:  Well, I mean would you concede that
24  if the information that she has from eight or nine people
25  would be sufficient for things like typicality and the
```

```
 1                          PROCEEDINGS                    16
 2   other criteria that are applicable in Rule 23?  I mean it
 3   seems like it's a fairly small sample out of 300 or 400
 4   employees.  And I mean, look, let's, you know, discovery
 5   concerning class certification issues prior to the class
 6   certification motion is routine in this court.
 7            MS. MELLK:  Well, I will note that Magistrate
 8   Peck, and since Mr. Lee referred to Magistrate Peck, in
 9   the Wang v. The Hearst Corporation, clearly said that the
10   plaintiff was trying to get in the back door (inaudible)
11   information they would only otherwise get if the
12   collective action is certified, and he specifically was
13   referring to the list
14            THE COURT:  Yeah, and Judge Pauley wrote in
15   Glad v. Fox Searchlight Pictures, "The weight of authority
16   in this district councils in favor of allowing disclosure
17   of class contact information in FLSA cases prior to the
18   conditional certification of a collective action," citing
19   a case decided by Judge Sand.
20            MS. MELLK:  We have another concern is that we
21   do believe that, we are concerned about the reason, about
22   the way in which the list will be used, and our concerns
23   are based on what Mr. Lee has been doing, and what he has
24   been doing is he's been using LinkedIn to send messages to
25   current and former, or I think current booking.com
```

```
 1                        PROCEEDINGS              17
 2   employees and has said – this is just one of the printouts
 3   – "Tara sent you a message about" --
 4            THE COURT:   I'm sorry, just again, the first
 5   thing you said, Paris said?
 6            MS. MELLK:   Tara.
 7            THE COURT:   Tara.
 8            MS. MELLK:   "Sent you a message about
 9   (inaudible) on Indeed," which is a job search site.  And
10   then it goes on to say, "Booking.com, priceline.com
11   lawsuit opening at Lee Litigation Group."  And so this is
12   designed to look like a job opening targeting booking.com
13   --
14            THE COURT:   Can I see that for a second please?
15   Show it to Mr. Lee and then let me see it please, okay?
16            (pause in proceeding)
17            MS. MELLK:   And my client only learned about
18   this because somebody forwarded it to her.
19            THE COURT:   Are they all the same?
20            MS. MELLK:   No, it's a four-page document.
21            THE COURT:   All right, okay.  Just hold on for
22   one second.  Let me take a look at it.  I'm going to hear
23   from you further, but let me look at that first, okay,
24   please?  Thank you.  Just give me one second.
25            (pause in proceeding)
```

```
 1                      PROCEEDINGS                18
 2          THE COURT:   All right, I'm not familiar with
 3  social media, so maybe you want to tell me, who was this
 4  disseminated to or how is this out there, let me put it
 5  that way?
 6          MS. MELLK:   So they go on to job search sites
 7  that are linked in and found people who worked for
 8  booking.com and have sent that to them.   Look at a job.
 9          THE COURT:   You can – there are websites you
10  can go onto to find people who work for booking.com?
11          MS. MELLK:   LinkedIn.
12          THE COURT:   LinkedIn gives a list of people who
13  work for booking.com?
14          MS. MELLK:   Yes, you can – there were groups.
15  So it will show you everybody at booking.com.   There are
16  groups that you can belong to.   It's easy to search.
17          THE COURT:   So there's already a publicly
18  available list of people who work for booking.com?
19          MS. MELLK:   You can go onto – in fact, the
20  plaintiff testified that's how she was able to get a lot
21  of (inaudible).   (inaudible) by going on LinkedIn and
22  finding people that she knew.   I don't know if she did the
23  booking.com search, but certainly finding people that she
24  knew so that she could get the contact, their current
25  contact information.
```

```
 1                          PROCEEDINGS                    19

 2            So we --

 3            THE COURT:   Well, let me - I mean why is that a

 4   bad thing?  I understand why it's a bad thing from

 5   booking.com's point of view, but there have been some

 6   decisions lately post-Cheeks, there's also Judge Kaplan's

 7   decision in Knights of Cabiria I think it is --

 8            MR. LEE:   I'm sorry, which --

 9            (interposing)

10            THE COURT:   -- which talk about the importance

11   of the public knowing about the FLSA of employees, about

12   workers knowing about the FLSA and the rights that it

13   provides.

14            MS. MELLK:   Your Honor, we feel that this kind

15   of communication is duplicitous.  I mean it's saying, it's

16   getting people's attention say there's a job opening, not

17   there is an FLSA lawsuit.  I mean that's how they got

18   their attention.

19            So we are concerned about the use - we don't

20   really know why he needs a list.  He's got people out -

21   there's no dispute as to how these people were paid.  They

22   were all classified as exempt.  That is not a dispute.  So

23   certainly the payroll records are not going to be able to

24   provide anything that would be of use in a collective

25   action certification motion since it is not a merits
```

PROCEEDINGS                     20

1

2  motion.  We are not disputing that the account managers

3  and the key account managers were classified as exempt.

4          THE COURT:  Well, are you willing to concede

5  that the plaintiff's claims here are typical of the claims

6  of other account managers and key account managers and

7  that they present common questions of fact?

8          MS. MELLK:  We are not willing to concede that

9  key account managers in every office of booking.com

10 performed their jobs in the same manner.  And he already

11 has another opt-in in New York.

12         THE COURT:  Yeah, but that's two out of several

13 hundred.

14         MS. MELLK:  I mean, well, the standard you're

15 citing to is only applicable for the New York group.

16         THE COURT:  Well, how many are in New York?

17         MS. MELLK:  About 40.

18         THE COURT:  So what is that, 4 percent roughly

19 or 5 percent of the employees in New York?

20         MS. MELLK:  Well, when we calculated the

21 approximate 300 number, we went back three years.  So

22 there aren't a total at this point of 300 account managers

23 and key account managers.  That is the total of the

24 (inaudible) collective.

25         THE COURT:  No, but without this information,

```
 1                        PROCEEDINGS              21
 2  how does the plaintiff draft a motion for 216(b) condition
 3  cert or Rule 23 certification?
 4          MS. MELLK:   Your Honor, Miss Amhaz, at least
 5  with respect to New York, testified that she's spoken to
 6  many people, and that --
 7          THE COURT:   I think you told me eight or nine
 8  out of several hundred.
 9          MS. MELLK:   Well, many of those were in New
10  York and there's only 40 in New York.  And her testimony
11  was that when she reached out to them, she spoke to them,
12  she told them about her wage claims, she told them her
13  belief that they were misclassified, and she asked them to
14  call Mr. Lee.  I don't know if they called Mr. Lee.  We
15  know one other opt-in who apparently opted in in August,
16  but we just learned of it in November.
17          And she clearly, she was able to identify with
18  three other key account managers that she worked in New
19  York, and just to be clear, she was in Las Vegas, and then
20  in December of 2014 she transferred to New York, and she
21  left New York in May of 2015.  So she was in New York for
22  a six-month period of time.  And she was able to identify
23  everybody that she worked with in New York.
24          THE COURT:   Right, but that's still a small
25  percentage of the people in New York.  I mean it sounds
```

1                            PROCEEDINGS                    22

2  like it's less than --

3            (interposing)

4            MS. MELLK:   -- probably about at least a

5  quarter.

6            THE COURT:   I mean are there 40 people over the

7  six-year limitations period?

8            MS. MELLK:   Correct.  Yes.  Over the six-year

9  period.  There were three other - she was a key account

10 manager while she was in New York.  There were three other

11 key account managers, one of whom I believe is an opt-in

12 in this case.

13            THE COURT:   Well, why is she - tell me why you

14 believe she's not entitled to, why plaintiff is not

15 entitled to contact information nationwide for at least a

16 three-year period for the FLSA limitations period?

17            MS. MELLK:   In her affidavit, I mean she talks

18 about - she lists - let's see, -- she lists 11 people --

19            THE COURT:   Which affidavit are you referring

20 to?

21            MS. MELLK:   This is an affidavit that the

22 plaintiff provided to us again, I think this was given -

23 we took her deposition on Tuesday and we were given this

24 affidavit at 6:45 p.m. on Monday --

25            THE COURT:   I haven't seen this affidavit.

| 1 | PROCEEDINGS | 23 |

2              MR. LEE:   Yeah, it's not part of the submission

3   for this discovery dispute, Your Honor.

4              MS. MELLK:   It's not part of --

5              THE COURT:   Can I see it for a second please?

6              MS. MELLK:   I'm just going to see if I can find

7   a clean copy.

8              THE COURT:   Okay.

9              (pause in proceeding)

10             THE COURT:   Just give me a second to take a

11  look at it.   Thank you.

12             (pause in proceeding)

13             THE COURT:   And why was this affidavit

14  submitted?

15             (interposing)

16             THE COURT:   Well, either one.   Why was the

17  affidavit submitted?   Go ahead.

18             MR. LEE:   Thank you, Your Honor.   The

19  affidavit, I'm not sure what's considered late or early,

20  but there is a contemplated collective motion that we are

21  intending to file at some point.   There was a deposition

22  scheduled I believe last Tuesday, this past Tuesday.   And

23  Miss Amhaz lives outside of New York, so she had to fly

24  into New York in order to be deposed this past Tuesday.

25                 To avoid having her to let's say come twice

 1

 2   because if we were to submit an affidavit from Miss Amhaz

 3   with a collective motion subsequent to her deposition on

 4   Tuesday, I wanted to avoid a situation where defendants

 5   say, hold it, we want to depose her because she submitted

 6   an affidavit to support her motion which was not provided

 7   before our deposition --

 8             THE COURT:   Okay.

 9             MR. LEE:   So in full disclosure, and she was

10   only able to fly in the day before to be prepped for her

11   deposition, and that's when we wrote this, and because it

12   was a full day prep, that took all day --

13             THE COURT:   All right.

14             MR. LEE:   -- we weren't able to complete it

15   until prior, just to the deposition.

16             THE COURT:   Let me go back to Miss Mellk. You

17   were in mid-argument when I asked to see the affidavit, so

18   go ahead.

19             MS. MELLK:   I do want to note something before

20   I forget it.  With respect to the Rule 23 class, one of

21   the other issues that we have, and Mr. Lee and I have not

22   discussed this fully, but Miss Amhaz is not an adequate

23   class representative.  She's got a sexual harassment claim

24   pending against my client that's part of this lawsuit, two

25   claims --

```
 1                          PROCEEDINGS                    25

 2            THE COURT:   Yeah, I've looked at the complaint.

 3            MS. MELLK:   So, therefore, I just wanted to

 4   bring that before the Court.  I know it's not really the

 5   issue right now, but certainly her interests are different

 6   than the class members within New York.  While I don't

 7   have the case law in front of me, I do believe that there

 8   is case law that supports our position.

 9            So in any event, we don't think there's any need

10   to provide a class list at this point, that you've read

11   Miss Amhaz's affidavit.  She's got plenty of ways to

12   contact people who she believes has knowledge about – and

13   it's really --

14            THE COURT:   Well, in opposition – let me ask

15   you this.  I mean in opposition to 216(b) motion and Rule

16   23 motion, I mean I presume the defendant wants to reserve

17   its rights to rely on information concerning account

18   managers other than the 11 that she has identified here.

19            MS. MELLK:   We do, Your Honor.

20            THE COURT:   Yeah, I mean the number that she

21   knows about sounds like it's a fairly small subset of the

22   universe of account managers and key account managers.  Am

23   I misunderstanding something?

24            MS. MELLK:   Well, at her deposition her

25   testimony was that every time she went to a training or to
```

PROCEEDINGS                    26

1

2  a meeting, and that she went to at least eight or nine

3  trainings or meetings in Amsterdam and other trainings,

4  all of the account managers and all of the key account

5  managers were there and they would all talk and she knows

6  who they are.

7          THE COURT:   No, but – you know, I go to

8  training programs the Federal Judicial Center holds where

9  there are magistrate judges from across the nation there,

10  but I could give you maybe two or three names but that's

11  about it.  I suspect that her experience at these training

12  seminars is going to be the same.  I mean is there a

13  contact list disseminated at these programs?

14          MS. MELLK:   I'm not sure there's a contact

15  list, but she also said that they keep in touch after the

16  trainings.

17          THE COURT:   With hundreds of people?

18          MS. MELLK:   There weren't hundreds of people

19  while she was there.  The 300 number comes in over a

20  three-year period of time.  So there weren't hundreds

21  while she was there.

22          And, Your Honor, I do go back – I have very

23  significant concerns that if we were to provide contact

24  information to Mr. Lee, I am concerned about how that

25  contact information would be used.  And I also want to

```
 1                        PROCEEDINGS                    27

 2   note I did read the Schnippers decision because I was, it

 3   was obviously served on me and I wanted to come prepared.

 4   But my understanding of what was done by the judge, Judge

 5   Ramos in that case is that the issue in that case was

 6   whether or not the five restaurants acted as an

 7   enterprise, and so I don't believe the Judge ordered a

 8   list.  I believe he ordered the production of payroll

 9   records, and he ordered that the personal information on

10   those payroll records be redacted.  So that was my reading

11   of it, and admittedly I read it only once.  So I don't

12   think that that, you know, certainly supports.

13           But I do have very significant concerns about

14   how the information would be utilized and --

15           THE COURT:  Oh, he's going to use the

16   information to reach out to them presumably and solicit

17   them as additional plaintiffs.

18           MS. MELLK:  Yeah, well, to me it's sort of

19   improper solicitation.  It's one thing to call people and

20   ask for information; it's another to improperly solicit

21   them to be a member of a collective action.  I mean that's

22   why we have the notice provision under 216(b) so that the

23   court can regulate the communications between the parties

24   and potential class members.

25           MR. LEE:  Your Honor, can I respond --
```

```
1                          PROCEEDINGS                    28

2          THE COURT:   Anything else you want to tell me?

3   Let me just finish with defense counsel here.

4          MS. MELLK:   So I was just talking about the

5   class list.  Certainly, in terms of the documents that Mr.

6   Lee is seeking, and he's seeking all of the wage related

7   documents, and I'm sure Your Honor looked at the document

8   production request and the interrogatory requests relating

9   to the amount of wage information.  Again, it's not

10  necessary at this stage of the game.  We are not disputing

11  that all of these individuals were exempt.  So it's just

12  not necessary.

13          And in terms of having to actually produce that

14  information, it is incredibly burdensome, will be

15  incredibly expensive for my client, and as Your Honor

16  knows, this is an opt-in action.  If people opt in, we

17  will provide that information.  But certainly to make us

18  provide it at this stage of the game is not proportional

19  to the needs of the case.

20          THE COURT:   All right.

21          MR. LEE:   Thank you, Your Honor.  As the Court

22  noted, Miss Amhaz has some information that can support

23  the motion.  I don't think it's up to the defendants to

24  dictate how much evidence plaintiff should be able to

25  provide to the Court.  We've - we believe that having
```

```
 1                          PROCEEDINGS                    29
 2   additional people that we can speak with, obtain
 3   additional information to support the motions would be
 4   helpful, and we believe defendants providing a contact
 5   information and the payroll information, which is I
 6   believe all automated, I think all they have to do is push
 7   a button, would not be burdensome.  Thank you, Your Honor.
 8              THE COURT:  All right.
 9              MS. MELLK:  Your Honor, may I just --
10              THE COURT:  Go ahead.
11              MS. MELLK:  -- say one thing?
12              THE COURT:  Go ahead.
13              MS. MELLK:  I do want to note that Mr. Lee took
14   our 30(b)(6) witness deposition.  Between now and January
15   9, he's going to take three managers' depositions, and
16   then he's going to take the former head of HR's deposition
17   in early February.  So certainly he's able to gather quite
18   a bit of information from all those people as well.
19              MR. LEE:  I think having oral testimony is
20   helpful, Your Honor, but I think --
21              THE COURT:  Let me come back to Miss Mellk for
22   a minute.  I mean the oral testimony is going to give him
23   the contact information.
24              MS. MELLK:  Correct, Your Honor.
25              THE COURT:  Yeah.  All right.  Go ahead, what
```

```
1                          PROCEEDINGS                    30
2   did you want to say?
3           MR. LEE:   Yeah, I believe frequently the
4   documentary evidence is more helpful because people's
5   memories aren't clear, and obviously she's not going to be
6   able to spew off 300 people's contact information off the
7   top of her head.  And I don't think that the list is only
8   300, you know, in the context of these class claims for a
9   large corporate – it's not unduly burdensome.  I mean 300
10  is a number for a class list that is very common.  Thank
11  you, Your Honor.
12          THE COURT:   All right.
13          (pause in proceeding)
14          THE COURT:   Well, I've looked at – well,
15  despite the fact that I have a lot of reservations about
16  the adequacy of defendant's responses to the discovery
17  requests under the December 2015 amendments to the Federal
18  Rules of Civil Procedure, I'm not going to find a waiver
19  at this time because, well, first of all, plaintiff
20  doesn't argue it, I guess maybe that's the most compelling
21  reason.  I am going to distribute to counsel though copies
22  of Judge Peck's decision in Fisher v. Forrest, and I
23  strongly recommend that you take a look at it and take a
24  look at the December 2015 amendments because boilerplate
25  objections to discovery requests really are no longer
```

PROCEEDINGS                    31

valid and haven't been valid for the last two years.  But

the bar, many members of the bar have not learned that

fact yet.

        With respect to the scope of the discovery that

the plaintiff is seeking here, I think the plaintiff's

scope of discovery is beyond what's appropriate prior to a

condition certification motion or a class certification or

the granting of conditional certification or class

certification.  He's seeking detailed, plaintiff is

seeking detailed information about other account managers

and key account managers which I think, prior to

conditional cert or class certification, they're not in

the case.

        However, as Judge Pauley pointed out in Glatt v.

Fox Searchlight Pictures, 2012 W.L. 2108220, 2012 W.L.

2108220 (decided June 11, 2012), "The weight of authority

in this district counsels in favor of allowing disclosure

of class contact information in FLSA cases prior to the

conditional certification of a collective action," and for

that proposition he cites Whitehorn v. Wolfgang's

Steakhouse Inc., decided by Judge Sand, 2010 W.L. 2362981

(S.D.N.Y., June 14, 2010), and also Judge Maas's decision

in Faye v. West LB, 2008 W.L. 7863592 (S.D.N.Y. 2008).

The same result was also reached by Judge Ramos in a case

```
 1                          PROCEEDINGS                    32
 2   called Mata v. Foodbridge, 2015 W.L. 3457293, 2015 W.L.
 3   3457293.
 4            So what I am going to direct is that defendant
 5   provide the names, dates of employment, addresses,
 6   telephone numbers, and email addresses to the extent they
 7   have that information for account managers and key account
 8   managers.  I'm going to direct that it be provided for
 9   account managers and key account managers in New York for
10   the period for six years prior to the commencement of the
11   action, for key account managers and account managers
12   employed for six years prior to the commencement of the
13   action for those individuals who worked in New York, and
14   for those individuals outside New York for three years
15   prior to the commencement of this action.  Information
16   beyond that I think is premature at this time.
17            All right, how much time do you need to do that?
18            MS. MELLK:  Our client, I mean it's Christmas,
19   it's holiday time, so we'll need a couple of weeks.
20            THE COURT:  I mean is this information that you
21   can, that they can print out on the computer fairly easily
22   or you don't know?
23            MS. MELLK:  I don't know.  I don't know.  Your
24   Honor, while you're looking for dates --
25            THE COURT:  Well, it's not going to take me
```

```
  1                          PROCEEDINGS                    33
  2   long.  Can you do it by January 12?  That's the end of the
  3   second week in January.  So that's three weeks from today.
  4          MS. MELLK:   We will do our best to comply by
  5   that date, and if we're unable to, we'll --
  6          THE COURT:   Okay.
  7          (interposing)
  8          MS. MELLK:   -- inform Mr. Lee and the Court.
  9          THE COURT:   All right.  What else?
 10          MS. MELLK:   I just, you know, again, I just
 11   wanted to reiterate our concerns about - we understand
 12   you're ordering us to provide the contact information, but
 13   we certainly are very concerned about what the nature of
 14   the communications between Mr. Lee and these prospective
 15   class members is going to be based on this.  I mean I, you
 16   know, we understand that the plaintiff, I disagree that
 17   she's entitled to it, but certainly the Court's position
 18   is you can use it to investigate her claims.  But I'm very
 19   concerned that there's going to be actual solicitation.
 20   And so I think there has to be some sort of framework in
 21   how Mr. Lee's office is allowed to talk to these people
 22   and communicate with them because it's, frankly,
 23   prejudicial to my client.
 24          THE COURT:   Well, is the prejudice that you're
 25   concerned about is the possibility of additional claims
```

```
 1                          PROCEEDINGS                      34
 2   being asserted or something else?
 3            MS. MELLK:   Well, look, as you know, Jackson
 4   Lewis, my office handles lots of these cases.  We
 5   understand a notice goes out, and notice is regulated by
 6   the court, and there are specific things that can be said,
 7   there's specific things that can't be said.  And so we
 8   understand people are going to opt in, they'll read the
 9   notice and they'll make their decision.
10            My concern, and I'm going to be very blunt, and
11   I apologize, is that the call goes out, hey, you can join,
12   you know, there might be money in this for you, come, you
13   know, sue them.  You know, that's different than calling
14   people to say we want to get some information about what
15   your job duties were.  That's a different kind of
16   conversation, and that's really - what this is about, in
17   my understanding --
18            THE COURT:   But as a practical matter - look, I
19   haven't ordered the production of email addresses, and I
20   think your concern --
21            MS. MELLK:   You did order the production.
22            THE COURT:   Well, all right, then I'm going to
23   revise my ruling and remove email.
24            MS. MELLK:   Thank you, Your Honor.
25            THE COURT:   But having done that, the number,
```

```
 1                        PROCEEDINGS                    35
 2   as a practical matter, I think the number of individuals
 3   that plaintiff can contact is going to be modest.
 4          MS. MELLK:   I feel much more comfortable not
 5   having to provide the email --
 6          THE COURT:   Email, yeah, okay, no emails.
 7   Okay.  But I mean ordinarily you wouldn't be entitled – if
 8   this was purely a case involving identification of
 9   potential witnesses as opposed to potential witnesses who
10   may also be parties, you wouldn't be entitled to judicial
11   oversight of what your adversary says to potential
12   witnesses.
13          MS. MELLK:   But, Your Honor, my understanding
14   of why we are being asked to product a contact list is so
15   that the plaintiff is able to support her certification
16   motion in the face of our objection.  It's not to prove
17   her claim, and it's not to look for more parties.  It's to
18   be able to have facts to show that she is similarly
19   situated to other people in the other offices, etc.  It's
20   not --
21          (interposing)
22          THE COURT:   Merits discovery, there's no
23   bifurcation here of merits discovery or class discovery.
24   So I mean she can talk to these people to get evidence to
25   support her claims.
```

```
 1                        PROCEEDINGS              36

 2            MS. MELLK:   And we understand that, that's what

 3   we understand why we're being ordered to give the list.

 4   But we're concerned that it's going to be like come sue,

 5   come, you know, why don't you join us instead of we're

 6   trying to get information about a lawsuit that we're

 7   bringing and we want to understand what your job duties

 8   were.  That's a different conversation.  And whatever they

 9   make take from it, they may take, oh, is there a lawsuit,

10   I want to join.  That I understand.  But having a

11   conversation of we're bringing a lawsuit, you know, asking

12   questions and saying it in a manner where we're trying to

13   encourage people to join is different to mean is really

14   not the purpose of providing the contact list.

15            And my concerns are valid based on the document

16   that's sitting on top of your desk.  And so that's – I

17   just want to really articulate that because it is a

18   concern to us.

19            MR. LEE:   Could I --

20            THE COURT:   Mr. Lee.

21            MR. LEE:   Could I address this, Your Honor?

22   Thank you.  You know, I worked with Miss Mellk for many

23   years now, and I'm a little bit disconcerted by the

24   allegations that's being alleged.  Firstly, even in the

25   document that Miss Mellk in her best effort to disparage
```

1                              PROCEEDINGS                    37

2   me with we're not soliciting.  The language is very clear

3   we're investigating the claims.  And I've done many, many

4   of these claims, Your Honor, and I don't think that for

5   this one case I would be wanting to risk a reprimand

6   because any person that I'm contacting potentially can be

7   reaching, could still be an employee of booking.com and

8   could be working with defendants --

9              (interposing)

10             THE COURT:   -- "pending lawsuit against

11  booking.com and priceline.com, here is the link," and then

12  there's an email, a web address.  "Here's the link for

13  more information.  If you have any information or would

14  like to join the lawsuit, please reach out."

15             MR. LEE:   And so --

16             THE COURT:   It comes right after a paragraph

17  that says, "This notice constitutes attorney

18  advertisement."  Go ahead.

19             MR. LEE:   Well, the language that we send out

20  is intended to be an investigation, and even though we

21  have the attorney advertising language, it's because there

22  have been times when people say we don't include that, and

23  they believe that it should be included.  So I just

24  include that language just to be safer because people say,

25  you know, we are, could be perceived to be an

PROCEEDINGS                    38

1

2    advertisement.

3           But I guess the issue about the email, Your

4    Honor, I would just ask that the Court reconsider because

5    frequently people use email a lot.  It's a correspondence

6    that --

7           THE COURT:  Well, they use the phone a lot too.

8           MR. LEE:  Understand.  That's fine, thank you.

9           THE COURT:  I mean frequently, in this day and

10   age a lot of people just delete emails from uniden -

11   senders that are unknown to them.

12          MR. LEE:  Understand.  I concede.

13          THE COURT:  Let me come back to Miss Mellk.

14   Miss Mellk, I understand what you're saying, but what

15   remedy are you seeking?  What do you want me to do?

16          MS. MELLK:  My remedy is that we don't

17   (inaudible).  I mean --

18          THE COURT:  That horse has left the barn.

19          MS. MELLK:  I mean to the extent that he's

20   sending a mailing, I think we should have a copy of the

21   mailing.  I want to see what he's sending to these people

22   so that if we have issues, we can bring it to the Court's

23   attention.

24          THE COURT:  Well, the problem I have with that

25   though is that ordinarily what an attorney says to a

```
 1                         PROCEEDINGS                    39
 2    potential witness, the communication with a potential
 3    witness is work product.
 4              MS. MELLK:   He's reaching out to contact these
 5    people.  He's got a --
 6              (interposing)
 7              THE COURT:   Right, and they're sort of in a
 8    hybrid role.  They're potential parties, they're potential
 9    witnesses.  Right?
10              (interposing)
11              THE COURT:   And ordinarily --
12              MS. MELLK:   -- (inaudible), look, I'm
13    concerned.  That's what I'm noting to the Court.  I am
14    concerned about the nature of the communication, and,
15    again, it's based - yes, I've known Mr. Lee for years.
16    This case is turning out to be somewhat more contentious
17    than most of our other cases.  But, you know, I have to
18    protect my client.  And, frankly, I'm concerned that it's
19    not, you know --
20              THE COURT:   Is what you're suggesting been done
21    in any other case that you're aware of?
22              MS. MELLK:   I think courts in reacting to
23    concerns like mine, like Magistrate Peck did in Wang v.
24    Forrest and then I have a couple - what all of the judges
25    in the Eastern District do is they don't allow (inaudible)
```

PROCEEDINGS                    40

1
2  to be circulated.  I understand Your Honor's ordered it,

3  but I certainly, you know, I will note that we will be

4  paying attention, and I, you know, I think - again, my

5  concern is there's going to be an improper solicitation.

6          MR. LEE:   Your Honor, I've been adequately

7  forewarned by Miss Mellk, and I obviously will conduct

8  myself in a manner to limit her concerns.

9          THE COURT:   Well, I'm not - I mean, Miss Mellk,

10 if you have authority or if you have precedent for some

11 kind of judicial oversight at this stage, I would welcome

12 it and I would be happy to consider it.  But I'm not, you

13 know, as I said, ordinarily, you know, Hickman v. Taylor

14 was about an attorney's communication with a witness, and

15 that's sort of the heartland of work product.

16         MS. MELLK:   And --

17         THE COURT:   And that's the conflicting interest

18 here.  I understand what you're saying.

19         MS. MELLK:   And this is why I go back to why

20 many courts, and, again, I understand --

21         THE COURT:   Not the weight of authority in this

22 district according to Judge Pauley --

23         (interposing)

24         THE COURT:   -- and Judge Sand.

25         MS. MELLK:   Your fellow magistrates, I mean,

```
 1                         PROCEEDINGS                    41
 2   you know, Wang v. Hearst --
 3              THE COURT:   I have the highest respect for my
 4   fellow magistrate judges, but it's a hierarchical system.
 5              MS. MELLK:   Your Honor, I – the mechanism of
 6   the FLSA is --
 7              THE COURT:   That horse has left the barn.
 8              MS. MELLK:   Yeah, I mean, look, I can go look,
 9   and certainly if I find something, I'll bring it to the
10   Court's and Mr. Lee's attention.  But I am very concerned
11   about this, and, you know, I think it prejudices my
12   client.
13              THE COURT:   All right.  Well, again, if you
14   have authority for some kind of judicial oversight in this
15   district, I would consider it and I welcome it.  But with
16   respect to the decision on what gets disclosed, there's
17   compelling authority from district judges in this court,
18   at least three, one of which states that the weight of
19   authority permits this kind of disclosure.  That was Judge
20   Sand's language in the case that was quoted by Judge
21   Pauley.  And Judge Sand was certainly I think one of the
22   giants of the bench.
23              All right, I'm going to adhere to my decision.
24   Again, if you have some authority, I'd be happy to
25   consider it.
```

```
 1                          PROCEEDINGS                    42

 2          Mr. Cansalarich (phonetic), these two go back to

 3   defendant's side.  Let me ask you also to give each side

 4   of a copy of Judge Peck's decision in Fisher v. Forrest

 5   and suggest that they review it because reliance on

 6   boilerplate objections these days can get you into trouble

 7   that you don't want to get into.

 8          All right, anything else - I now have the case

 9   for general pretrial supervision, so if you have more

10   discovery disputes, they should be before me or scheduling

11   issues they should be before me, but the reference from

12   Judge Daniels was not just for this discovery dispute but

13   also for GPT.

14          Mr. Lee, anything else we should be considering

15   today from your point of view?

16          MR. LEE:  Yes, Your Honor.  In terms of e-

17   discovery, I had been in correspondence with defendants

18   who tried to obtain e-discovery.  We had provided the

19   search terms for them.  And my understanding is that they

20   did not agree to my search terms or the custodians, and

21   that's a current dispute that's outstanding that --

22          THE COURT:  This was one of your document

23   requests I think?

24          MR. LEE:  Yes, it's number 31, Your Honor.

25              (pause in proceeding)
```

```
 1                        PROCEEDINGS                  43

 2              THE COURT:   Have you sat down and tried to

 3    negotiate search terms?

 4              MR. LEE:   I have, Your Honor, and we met and

 5    conferred.  I can – we can endeavor to do it again because

 6    I know the Court is busy.  And is Miss Mellk is amenable

 7    to that, we can try to redouble our efforts to try to

 8    resolve it without judicial interference.

 9              MS. MELLK:   Your Honor, I'm more than happy to

10    sit down again Mr. Lee and see if we can work through it,

11    but our understanding, and this was based on a

12    communication we had after we had a meet and confer, was

13    that we agreed that we would search Michelle Vrod, V-R-O-

14    D, who is Miss Amhaz's, who was her supervisor, and Amy

15    Acceturra who was the former head of HR, we would search

16    her emails and produce any emails that reference Miss

17    Amhaz.  So if there's additional things that Mr. Lee would

18    like, I am more than happy to sit down and have a second

19    conversation before we have to get the Court involved.  We

20    certainly understand e-discovery and obligations.  So I

21    think that the parties can try and work that out, but we

22    did agree to produce them and the search is being done.

23              MR. LEE:   Your Honor, I think the issue is the

24    defendants agree that that's what they would produce.  I

25    didn't think that was enough.  They would only allow
```

```
 1                           PROCEEDINGS              44
```

```
 2   production for emails between Miss Acceturra and Miss Vrod

 3   with Nancy's name.  I don't think that's sufficient.  I

 4   have a broad list of email search terms which I think

 5   should be used.  They've wholesale refused to provide any

 6   searches in terms of the search terms I've included which

 7   would include --

 8               THE COURT:   I'm looking at your search terms.

 9   I think these are going to generate a huge volume of

10   documents.

11               MR. LEE:   Well, I believe that under the -

12   first of all, you know, there hasn't been an agreement on

13   who the custodians are and, once we agree on who the

14   custodians are, what the search terms should be.  Now, my

15   position is that they should produce --

16               THE COURT:   I mean her HR - her claim under the

17   human rights law relates to what she was told to do?

18               MR. LEE:   Yes, it's --

19               THE COURT:   And how she was told to interact

20   with clients?

21               MR. LEE:   That's right.  Her --

22               THE COURT:   It's not a pay discrimination

23   claim, is it?

24               MR. LEE:   I'm sorry, Your Honor?

25               THE COURT:   It's not a pay discrimination
```

| 1 | PROCEEDINGS                     45 |

2    claim.

3            MR. LEE:   It's not a pay discrimination.  She's

4    alleging sexual harassment in that her immediate

5    supervisors would --

6            THE COURT:   Told her --

7            MR. LEE:   -- to look sexy.

8            (interposing)

9            THE COURT:   -- certain way to clients, okay.

10           MR. LEE:   That's right.

11           THE COURT:   Well --

12           MS. MELLK:   Your Honor, I'm, as I said, as Mr.

13   Lee suggested, I'm more than happy to sit down with him

14   one more time to take a shot at custodians and search

15   terms before we need to involve the Court.  Our

16   understanding, and we put it in an email that was not

17   rejected by Mr. Lee, was this is what we were going to do.

18   Again, I'm more than happy to try and be cooperative and

19   (inaudible).

20           THE COURT:   Usually, the emails tend to be more

21   relevant or take on a greater role in cases where there's

22   an allegation of a failure to promote or pay

23   discrimination as opposed to the kind of claims that are

24   asserted here.  I mean I'm looking over your search terms,

25   Mr. Lee, and I think they're going to generate --

```
 1                        PROCEEDINGS                46
 2            MR. LEE:   The --
 3            THE COURT:   -- an awful lot, a lot of
 4   irrelevant documents  --
 5            (interposing)
 6            MR. LEE:   Your Honor --
 7            THE COURT:   Let me suggest this.  Does the
 8   defendant have an IT department or an IT specialist?
 9            MS. MELLK:   The way that it's, that the e-
10   discovery is done is that we retain a third party, and the
11   emails are brought, they're downloaded onto the third-
12   party system.  I mean it's a timely and expensive process.
13            THE COURT:   Yeah.
14            MS. MELLK:   And so we certainly would prefer to
15   do it in a way that is not wasteful and doesn't, you know,
16   obviously the defendant pays for this.  And so, again, I'm
17   willing to sit down with Mr. Lee and see if we can come to
18   some agreements about narrowing the terms, I mean there's
19   not that many custodians.  There's Amy Acceturra who was
20   the head of HR.  There's the plaintiff, and she testified
21   - I will tell you, Your Honor, she testified she never
22   complained about exemption issues or classification issues
23   or anything like that during her employment, and with
24   regard to her sexual harassment claim, she says the first
25   time she complained was in, was approximately a couple of
```

```
 1                          PROCEEDINGS                    47

 2   weeks before she left.

 3          So, again, we're more than - if HR had any

 4   communication with anybody about her complaint, we're more

 5   than happy to produce it.  We're more than happy to, you

 6   know, we thought our agreement was to look at Michelle

 7   Vrod and Amy Acceturra.  I'm willing to have a discussion.

 8          THE COURT:  Let me ask you this, I mean because

 9   I know your firm represents, I think represents defendants

10   exclusively in the employment context.  Has your firm ever

11   utilized predictive coding in e-discovery matter?

12          MS. MELLK:  I believe in the Publicis case that

13   was before Magistrate Peck, I believe they used predictive

14   coding.  But --

15          THE COURT:  Did it work well or poorly or

16   something else?

17          MS. MELLK:  I don't know.  I don't know.  I

18   have to speak to my colleagues who handled that case.  But

19   there was a lot of - I believe there was - [To colleague:

20   You may know better than I.  Were you involved in the

21   Publicis case?]  But I certainly can find out and let the

22   Court know about whether it was effective.

23          Certainly, right now all we have is Nancy and --

24          THE COURT:  I mean, look, I'm inclined to limit

25   - I'm sorry.  I said I'm inclined to limit the e-discovery
```

1
2    at this stage to the limits suggested by Miss Mellk but
3    without prejudice to a renewed application for further e-
4    discovery from plaintiff, I mean if that's something both
5    sides can live with.  I mean a lot of times, many times a
6    defendant rather do e-discovery in one fell swoop because
7    each iteration has its own cost.
8              MS. MELLK:   That's fine with me, and, again,
9    I'm more than happy to a conversation, to avoid, you know,
10   Mr. Lee coming back to the court, we limit it to these
11   issues right now, and I'm – Mr. Lee and I can speak and
12   see if we can come to some sort of agreement about
13   expanding e-discovery.
14             MR. LEE:   Your Honor, my general understanding
15   of what's the most efficient way to proceed, and e-
16   discovery just takes a long time sometimes, is that under
17   the Sedona Conference protocols the parties try to agree
18   on a set of search terms, even if it is a little bit more
19   encompassing.  So I'm happy to try to revise some of these
20   search terms which may come up with false positives, but I
21   do think that the e-discovery should include more than
22   just Nancy herself individually, should include custodians
23   other than Miss Acceturra or Miss Vrod.  And it should be
24   sufficient to cover her sexual harassment claims
25   individually and to cover her potential class claims

```
 1                          PROCEEDINGS                    49
 2  across the various locations.  How we get there I'm happy
 3  to work that out with Miss Mellk.
 4            THE COURT:  Well, I mean preliminarily it seems
 5  to me that the universe of custodians you'd want to be
 6  searching with respect to her harassment claims, I would
 7  think would probably be narrower than the universe you'd
 8  be searching, than the custodians you'd be searching with
 9  respect to her other claims.
10            MR. LEE:  I don't disagree, Your Honor.
11            THE COURT:  All right.  Well, at this point,
12  why don't we - I'm going to limit the e-discovery to
13  emails and ESI from Vrod and Acceturra that refer to
14  plaintiff without prejudice to a renewed application after
15  counsel have had an opportunity to confer further on this
16  issue.  And I guess the next time we discuss this issue I
17  guess what I'd like to see is, if you can't come to an
18  agreement, a list of the custodians - well, presumably
19  there's going to be some custodians on which you agree, I
20  hope, and with respect to the custodians on which you
21  disagree, your respective positions on them and the same
22  with respect to the search terms on which you disagree.
23            MS. MELLK:  And if we get to that point, I'll
24  be able to give you more information on predictive coding
25  as well.
```

```
 1                          PROCEEDINGS                      50
 2              THE COURT:   Yeah, have you used predictive
 3    coding, Mr. Lee?
 4              MR. LEE:   We have not.  We have not.
 5              THE COURT:   All right.
 6              MR. LEE:   So --
 7              THE COURT:   Go ahead.
 8              MR. LEE:   Judge, the one last topic, Your
 9    Honor, is, as it's towards the back of our letter, it's
10    regarding the 30(b)(6) witness topic list.  Defendants had
11    objected to a number of our topics that we wanted to ask
12    the 30(b)(6) witness, many of which relate to her sex
13    harassment claim or the common enterprise analysis.
14              THE COURT:   I'm sorry, I'm looking at
15    defendant's letter of November 15 I guess which lists the
16    topics that are in dispute.
17              MR. LEE:   Yes.
18              THE COURT:   Which ones do you want to talk
19    about?
20              MR. LEE:   So I'm just going down the list.
21    Subject matter number 11, complaints regarding sex
22    discrimination or harassment for other employees.  I
23    believe that's important because it shows how they handle
24    sex harassment claims and whether they are wholesale
25    ignored or whether they have some protocol that they
```

```
 1                        PROCEEDINGS                   51
 2   actually follow.  The allegation from Miss Amhaz is that
 3   she complained to multiple people and she was not able to
 4   get a proper response, and that's why she terminated her
 5   employment at the end because she felt such an oppressive
 6   work environment that she was not able to continue working
 7   there.
 8             MS. MELLK:   Your Honor, if I may --
 9             THE COURT:   Go ahead.
10             MS. MELLK:   Number one, that wasn't what she
11   testified to.  She testified she didn't complain.  She
12   didn't complain until in or about May (inaudible).  So
13   when she left, she gave her notice of leaving on May 11,
14   and left May 27.  So that is just plain untrue.
15             Number two, at the 30(b)(6) deposition, we
16   produced the current head of HR.  Mr. Lee did not ask him
17   what is the company's procedure for investigating sexual
18   harassment claims?  What do you do?  We agreed with Mr.
19   Lee at the 30(b)(6) witness deposition that the 30(b)(6)
20   witness was prepared to answer questions about sexual
21   harassment claims in the New York office and in the Las
22   Vegas office.  Her claim is a very limited claim.  She
23   claims that her supervisor --
24             THE COURT:   She was allowed to answer questions
25   about claims, sexual harassment claims --
```

```
 1                         PROCEEDINGS                52
 2            MS. MELLK:   Yeah, New York and Las Vegas.  But
 3  he never asked what was the process for investigation,
 4  what do you do?  We produced policies.  So, you know, I
 5  think that is, it is, that issue is disingenuous.  Yeah,
 6  he asked a question, are you aware of anybody in New York
 7  or Las Vegan who's had a claim.  This is Mr. Lee asking my
 8  30(b)(6) witness.
 9            THE COURT:   And what is the answer?
10            MS. MELLK:   No, other than Miss Amhaz.
11            THE COURT:   Okay.
12            MR. LEE:   But he --
13            MS. MELLK:   So - and he will be taking the
14  deposition of the former head of HR on February 2, and we
15  agree, I mean it's not a 30(b)(6) deposition because she's
16  no longer with us.  He certainly can ask her those kinds
17  of questions.
18            With respect to the other issues regarding the
19  so-called enterprise, we have already admit, stipulated to
20  him that we do not dispute that booking.com generates over
21  $500,000 in revenue.  So all of this, contracts, vendors,
22  bank, I mean it's irrelevant to her claim.
23            THE COURT:   Yeah.
24            MR. LEE:   Your Honor, it's not irrelevant
25  because even though they make more than the statutory
```

1                              PROCEEDINGS                    53

2   requirement, it goes to whether they're a common

3   enterprise.  There are factors that are considered,

4   factual factors in regards to whether they pay the vendors

5   out of one account through their different offices,

6   whether --

7              THE COURT:  Why is that important at this

8   stage?

9              MR. LEE:  Well, it goes to the common

10  enterprise analysis to see if the various offices and

11  locations and the employees are operative --

12             MS. MELLK:  We're not disputing that the

13  various offices of booking.com, I mean we just said we'd

14  produce a list of the 300 covered employees, not something

15  that we're disputing.  We are not claiming that the

16  Honolulu office of booking.com is a separate employer than

17  the New York office.

18             MR. LEE:  Well, I think that's a separate

19  issue.  The issue is whether they're a single integrated

20  enterprise --

21             THE COURT:  Why is that important?

22             MR. LEE:  It's important for the collective and

23  class analysis in regards to whether the same policies are

24  controlled by a single center.

25             THE COURT:  I think that's what Miss Mellk just

```
 1                         PROCEEDINGS                    54
 2   stipulated to.
 3            MR. LEE:   Okay, well, if she stipulates that
 4   they're a single integrated enterprise --
 5            (interposing)
 6            MS. MELLK:   -- single integrated - anybody who
 7   worked - we're giving you a class list of --
 8            MR. LEE:   She hasn't really said it on the
 9   record.
10            THE COURT:   Well, why don't you let her finish.
11            MR. LEE:   Okay.
12            THE COURT:   She was in mid-sentence.
13            MS. MELLK:   I'm giving you a class list of
14   everybody who was an account manager or key account
15   manager of booking.com.  We have never taken a position
16   that employees of booking.com U.S.A. are all part of a
17   single integrated enterprise.  That's never been our
18   position.
19            MR. LEE:   You mean you're saying --
20            MS. MELLK:   booking.com U.S.A. is a single inte
21   - you know, if you're a key account manager or account
22   manager for booking.com U.S.A., you are employed by
23   booking.com U.S.A.  I'm, frankly, a little surprised that
24   we're having this conversation --
25            THE COURT:   I'm not sure where you're doing,
```

```
 1                        PROCEEDINGS                 55
 2  Mr. Lee.
 3          MR. LEE:   Well, as long as she's stipulated
 4  that it's a single integrated enterprise, that's fine.
 5          THE COURT:   Okay.
 6          MR. LEE:   Thank you.
 7          THE COURT:   I mean it sounds like with respect
 8  to other complaints or allegations of sex discrimination,
 9  I mean Miss Mellk is telling me that the 30(b)(6) was
10  prepared to testify to that.
11          MR. LEE:   Well, he --
12          THE COURT:   With respect to the relevant
13  offices.
14          MR. LEE:   Well, he was new, but he didn't know
15  anything.
16          THE COURT:   That's not what she just read.
17          MR. LEE:   He said --
18          THE COURT:   That's not the testimony she just
19  read --
20          (interposing)
21          MS. MELLK:   If you had asked him different
22  questions --
23          MR. LEE:   I can't read his mind.  He was trying
24  to impede the deposition the whole time.
25          (interposing)
```

```
 1                       PROCEEDINGS                  56
 2           THE COURT:   Wait, wait, wait, wait, wait.  Say
 3   that - I didn't hear you, Mr. Lee.
 4           MR. LEE:   I'm just saying I couldn't read his
 5   mind because frequently he would, you know, not answer
 6   questions directly.  But that's fine.
 7           THE COURT:   That's why you ask follow-ups.
 8           MR. LEE:   I'm sorry?
 9           THE COURT:   That's why you ask follow-up
10   questions at a deposition.
11           MR. LEE:   I understand, Your Honor.  But, you
12   know, the president of booking.com was, he was hired for
13   sexual harassment.  There obviously is some stuff there.
14           THE COURT:   Did the plaintiff work with the
15   president of booking.com?
16           MS. MELLK:   No, Your Honor.  The plaintiff
17   worked in Las Vegas and --
18           (interposing)
19           MR. LEE:   And --
20           THE COURT:   No, that's what I understand.  I'm
21   not sure that everybody - I mean the fact that - I don't
22   know where you're going with this, Mr. Lee.
23           MR. LEE:   Your Honor, that's fine, you know, I
24   don't think the other people are 30(b)(6) witnesses
25   anyway.  So that's fine.
```

```
 1                         PROCEEDINGS                   57
 2              THE COURT:   All right.
 3              MS. MELLK:   Yeah, and he ask (inaudible).  I
 4  actually have one issue --
 5              THE COURT:   Go ahead.
 6              MS. MELLK:   Which we've raised to Mr. Lee and
 7  we haven't raised to the Court yet because we did want to
 8  take the plaintiff's deposition.  So with regard to her
 9  sexual harassment claim, she is claiming emotional
10  distress damages, and she testified as to how she's a
11  different person now than she was before, and she
12  testified that she posts on Facebook and on Instagram and
13  possibly other social media sites.
14              And so we have requested that historical
15  printouts of the Facebook and the Instagram and Snapchat
16  sites, and similar to our objections, we received --
17              THE COURT:   I'm sorry, Facebook, Instagram and
18  what, Snap --
19              MS. MELLK:   Snapchat.  If you have teenagers,
20  you would know these things.  Snapchat (inaudible).  And
21  she posted them during the sexual harassment, after the
22  sexual harassment, and so we feel it's relevant to our
23  ability to --
24              THE COURT:   But you've served a request for
25  these?
```

| 1 | | PROCEEDINGS | 58 |

```
 1                        PROCEEDINGS                   58

 2           MS. MELLK:   Correct.  And there was an

 3   objection, and then we sent a deficiency letter.  And,

 4   again, we didn't raise it to the Court because we wanted

 5   to see what she would say at her deposition, and she did

 6   confirm the postings.

 7           THE COURT:   Mr. Lee.

 8           MR. LEE:   We've never had a chance to meet and

 9   confer about this, Your Honor, so at the very least, I'd

10   like the opportunity to do so.  And this --

11           THE COURT:   Well, it sounds - my understanding

12   is --

13           (interposing)

14           THE COURT:   Hold on a second, hold on a second.

15   My understanding is that these applications are used, are

16   not used for privileged communications.  They're to

17   disseminate information on a wide basis?

18           MS. MELLK:   They're a social media.  You

19   connect with friends and other (inaudible) --

20           THE COURT:   I mean do you control who you

21   connect with?

22           MS. MELLK:   Yes.

23           MR. LEE:   Can I explain what these are?  So,

24   for example, on Facebook, Your Honor, if you were to open

25   a Facebook account and let's say your extended family
```

```
 1                        PROCEEDINGS                    59

 2   members live around the world, you can post a picture of

 3   yourself let's say hiking in the mountings or having

 4   dinner at a nice restaurant, and then it's an easy way to

 5   keep in touch with your friends and family around the

 6   world, and there are communities, depending on the type of

 7   usage or the type of social person you are, you can

 8   include people who are immediate family members, you can

 9   include, allow strangers to go on.  And so --

10            THE COURT:  You wouldn't use these applications

11   to communicate with your attorney or your priest or your

12   doctor, would you?

13            MR. LEE:  Not really, they're really to show --

14            MS. MELLK:  What's going on in your life.

15            MR. LEE:  -- how your life is --

16            (interposing)

17            THE COURT:  -- wider audience than one person.

18            MR. LEE:  Yeah, it goes to - well, it's more

19   than one person, but it would be restricted to the circle

20   of social sphere that you wanted, and you can be posting

21   some fairly personal information or you could be posting

22   not very personal information --

23            (interposing)

24            THE COURT:  Let me cut to the chase here.  I

25   would encourage you to have a meet and confer on this --
```

```
 1                         PROCEEDINGS                    60

 2              MR. LEE:   Thank you, Your Honor.

 3              THE COURT:    -- but it sounds to me like it's

 4   fair game.  I'm not going to rule on it today, but --

 5              MR. LEE:   My only concern is that it's --

 6              THE COURT:   It sounds like it's fair game.

 7              MR. LEE:   My only concern, Your Honor, is that

 8   this is not a personal injury case where she's alleging

 9   she was shot in the foot and that she has like huge health

10   problems, and then you see her jetskiing in the mountains.

11   There have been cases like that where that's appropriate.

12   But for here I believe that to request all of her social

13   media is disproportionate and not --

14              THE COURT:   Why is it disproportionate?  How

15   much is she seeking in damages and what's the cost of

16   producing it?

17              MR. LEE:   I think --

18              THE COURT:   Disproportionate is like the new

19   black.  People are throwing it around without any thought

20   whatsoever.

21              MR. LEE:   Well, I just think it's an invasion

22   of privacy --

23              THE COURT:   If she's putting it up on Facebook,

24   how is it private?

25              MS. MELLK:   And she's putting --
```

```
 1                          PROCEEDINGS                    61

 2              (interposing)

 3              MR. LEE:   Well, because it's only --

 4              (interposing)

 5              MR. LEE:   -- it's only for people that you

 6   like.

 7              THE COURT:   Well, it's a non-privileged

 8   communication though.

 9              MR. LEE:   So, for example --

10              THE COURT:   So how is it private?

11              MS. MELLK:   Your Honor, she --

12              THE COURT:   Look, I'm not ruling on it today.

13   I encourage you to meet and confer, but --

14              MR. LEE:   Thank you, Your Honor.

15              THE COURT:   -- you know, it seems to me, at

16   most, this is analogous to somebody seeking somebody's

17   diary, and there's no privilege that attaches to a diary.

18   Diaries are discoverable, entries in a diary are

19   discoverable if they're relevant.

20              MS. MELLK:   And in terms of producing --

21              MR. LEE:   Thank you, Your Honor.

22              MS. MELLK:   -- it, I believe it's merely push a

23   button.  You push a button and print it out.

24              MR. LEE:   Yeah, I think the issue is whether

25   it's relevant and (indiscernible) --
```

```
 1                      PROCEEDINGS                    62
 2              THE COURT:   Well, you know, if she's claiming
 3   emotional distress and she's going waterskiing in the
 4   Florida Keys or going down ziplines in the Amazon, that's
 5   probably relevant.
 6              MS. MELLK:   It is relevant because she
 7   testified that she stays in her home.  She doesn't come
 8   out of her house for three to four days.  She's much less
 9   social than she used to be --
10              THE COURT:   Well, I'm not - you know, look,
11   maybe there's something in her posts that is truly
12   irrelevant to the issues in this case, and maybe there's
13   some expectation of privacy.  Maybe she's sending it to
14   trusted friends or something.  I don't know what people
15   put up on these applications.  So I'm not going to address
16   it today.  I may need to wait to see if there are
17   specifics.  But it sounds to me if it's fair game.
18              MR. LEE:   Thank you, Your Honor.  We'll do some
19   research.
20              THE COURT:   You know, it's - if she's alleging
21   emotional distress - you know, if she put up some post,
22   you know, either complaining or congratulating a political
23   figure, you know, maybe that might be irrelevant.
24              MR. LEE:   Yeah, I'll give an example --
25              THE COURT:   So and so is a great candidate and
```

```
 1                         PROCEEDINGS                63
 2   I'm happy he or she was elected or so and so is a horrible
 3   candidate and I'm happy he or she lost.  I'm hard-pressed
 4   to see how that bears on emotional upset or emotional
 5   distress, but if she's posting vacation pics where she's
 6   having a good time, I think that is relevant.  So --
 7           MS. MELLK:   Or her engagement (inaudible) if
 8   she gets engaged.
 9           THE COURT:   Well, I'm going to encourage the
10   parties to meet and confer on that issue, but unless it's
11   something that doesn't bear on emotional distress, I think
12   it's probably - or doesn't arguably bear on emotional
13   distress, I think it's probably discoverable.  Okay?
14           MR. LEE:   Thank you, Your Honor.
15           THE COURT:   All right?  Anything else --
16           MR. LEE:   Appreciate the guidance, thank you.
17           THE COURT:   Again, I encourage you to read
18   Fisher v. Forrest because it, the December 15 amendments
19   really do work a major change in Article 5 of the Federal
20   Rules.  All right.  I hope you all have a good holiday and
21   a good new year.
22           MR. LEE:   Thank you, happy holiday, Your Honor.
23           (Whereupon the matter is adjourned.)
24
25
```

1                                                           64

2                    C E R T I F I C A T E

3

4          I, Carole Ludwig, certify that the foregoing

5   transcript of proceedings in the case of Amhaz v.

6   Booking.com, et al., Docket #17cv2120, was prepared using

7   digital transcription software and is a true and accurate

8   record of the proceedings.

9

10

11

12   Signature_____

13                    Carole Ludwig

14   Date:     December 26, 2017

15

16

17

18

19

20

21

22

23

24

25